UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF COLORADO

MICHELLE CHAVEZ,                              )
ALEX DE-LUNA-GALLEGOS,                        )
DIEGO LUGO,                                   )
CARLOS GUITERREZ-NIRA and                     )
ANTONIO ROGERS                                )
                                              )
    Plaintiffs,                               )        Civil Action No.
                                              )
v.                                            )
                                              )
ADVANCE STORES COMPANY, INC., a Virginia)
corporation d/b/a/ Advance Auto Parts,        )
                                              )
    Defendant                                 )

---

## COMPLAINT

Plaintiffs Michelle Chavez, Alex de-Luna-Gallegos, Diego Lugo, Carlos Guiterrez-Nira, and Antonio Rogers, by and through their counsel GRANT, HOFFMAN & KAMADA, PC, and McNAMARA, ROSEMAN & KAZMIERSKI, LLP, for their complaint against the Defendants, state and allege as follows:

### JURISDICTION AND VENUE

1.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1332, 1343 and 1367. This action is authorized and instituted pursuant to 42 U.S.C. § 2000 *et seq.* and 42 U.S.C. § 1981.

2.    The acts complained of herein were committed, or had their principal effect, within the District of Colorado, and therefore venue is proper within this District pursuant to 28 U.S.C. § 1391.

## PARTIES

3.    Plaintiff Michelle Chavez ("Ms. Chavez") is a citizen of the United States and a resident of and domiciled in the State of Colorado.  At the time of the acts complained of herein, Ms. Chavez was a resident of the State of Colorado.  At all times relevant to the allegations in this Complaint, Ms. Chavez was employed as a Commercial Driver for Defendant Advance Stores Company, Inc., a Virginia corporation d/b/a/ Advance Auto Parts ("Advance").

4.    Plaintiff Alex de-Luna-Gallegos ("Mr. Gallegos") is a citizen of the United States and a resident of and domiciled in the State of Colorado.  At the time of the acts complained of herein, Mr. Gallegos was a resident of the State of Colorado.  At all times relevant to the allegations in this Complaint, Mr. Gallegos was employed as a Retail Sales Associate for Defendant Advance.

5.    Plaintiff Diego Lugo ("Mr. Lugo") is a citizen of the United States and a resident of and domiciled in the State of Colorado.  At the time of the acts complained of herein, Mr. Lugo was a resident of the State of Colorado.  At all times relevant to the allegations in this Complaint, Mr. Lugo was employed as a Retail Associate for Defendant Advance.

6.    Plaintiff Carlos Guiterrez-Nira ("Mr. Nira") is a citizen of the United States and a resident of and domiciled in the State of Colorado.  At the time of the acts complained of herein, Mr. Nira was a resident of the State of Colorado.  At all times relevant to the allegations in this Complaint, Mr. Nira was employed as the Commercial Sales Manager for Defendant Advance.

7.    Plaintiff Antonio Rogers ("Mr. Rogers") is a citizen of the United States and a resident of and domiciled in the State of Colorado.  At the time of the acts complained herein, Mr. Rogers was a resident of the State of Colorado.  At all times relevant to the allegations in

2

this Complaint, Mr. Rogers was employed as a Second Assistant Manager for defendant Advance.

8.    Upon information and belief, Defendant Advance is a Virginia corporation with a principal place of business in Roanoke, Virginia.  Upon information and belief, Defendant Advance owns and operates approximately twenty-four (24) stores in the State of Colorado. Defendant Advance is an employer within the meanings set forth in applicable state and federal law, and was, at all times relevant to the allegations in this Complaint, Plaintiffs' employer.

## ADMINISTRATIVE PREREQUISITES

9.    Plaintiff Michelle Chavez filed a charge of retaliation and discrimination based on race and color, Charge No. 541-2011-00801, with the EEOC in February, 2011.  Plaintiff received a Notice of Right to Sue regarding those charges from the EEOC on June 13, 2013. Plaintiff's Complaint is timely filed in accordance with the Notice.

10.    Plaintiff Alex de-Luna-Gallegos filed a charge of retaliation and discrimination based on race and color, Charge No. 541-2011-00795, with the Equal Employment Opportunity Commission in January, 2011 with the Denver District Office.  Plaintiff received a Notice of Right to Sue regarding those charges from the EEOC on June 28, 2013.  Plaintiff's Complaint is timely filed in accordance with the Notice.

11.    Plaintiff Diego Lugo filed a charge of retaliation and discrimination based on race and color, Charge No. 541-2011-01123, with the EEOC in March, 2011 with the Denver District Office.  Plaintiff received a Notice of Right to Sue regarding those charges from the EEOC on June 13, 2013.  Plaintiff's Complaint is timely filed in accordance with the Notice.

12.    Plaintiff Carlos Guiterrez-Nira filed a charge of retaliation and discrimination based on race and color, Charge No. 541-2011-00933, with the EEOC in approximately Febuary,

2011 with the Denver District Office. Plaintiff received a Notice of Right to Sue regarding those charges from the EEOC on June 13, 2013. Plaintiff's Complaint is timely filed in accordance with the Notice.

13.    Plaintiff Antonio Rogers filed a charge of retaliation and discrimination based on race and color, Charge No. 541-2011-00401, with the EEOC in November, 2010 with the Denver District Office. Plaintiff received a Notice of Right to Sue regarding those charges from the EEOC on June 12, 2013. Plaintiff's Complaint is timely filed in accordance with the Notice.

## GENERAL ALLEGATIONS – MS. CHAVEZ

14.    Plaintiff Ms. Chavez repeats and re-alleges all previous paragraphs of this Complaint as though fully incorporated herein.

15.    Ms. Chavez is Native American and Spanish American.

16.    At all times relevant hereto, Ms. Chavez was fully qualified for her position. Ms. Chavez previously worked as a commercial driver.

17.    Ms. Chavez commenced her employment with Defendant Advance on December 27, 2007 as a Commercial Delivery Driver team member.

18.    Throughout the course of her employment with the Defendant Advance, Ms. Chavez was a good performer for the company and received positive feedback from her supervisors.

19.    Throughout the course of her employment with Defendant Advance, Ms. Chavez was subjected to discriminatory acts and a racially hostile work environment. Ms. Chavez's terms of employment were much different than her Caucasian co-workers. For example, Ms. Chavez worked 33% of the time as a retail associate as directed by her immediate supervisors Pete Jones and Troy Simmons. Caucasian employees who worked as retail associates had higher

4

rates of pay and were trained to be retail associates. Ms. Chavez never received compensation commensurate with the retail associate position or the training to perform those job duties.

20.     Additionally, Defendant Advance, though its managers, perpetuated an environment of racially animosity. Ms. Chavez's direct supervisors were Pete Jones, Troy Simmons and Alan Pullen. When Hispanic customers would enter the store, these managers would pull away from the counter, move away from the customer, and leave them there. Inevitably, Ms. Chavez would tend to the Hispanic customer although she was strictly a commercial delivery driver.

21.     Defendant Advance had a pattern and practice of disparate treatment towards non-Caucasian employees. For example, as part of the retail operations, truck deliveries of retail merchandise would be made to the store periodically. At those times, managers Troy Simmons and Alan Pullen would direct the non-Caucasian employees to "do truck," a duty which entails unloading the merchandise and placing it in the store's inventory. As the non-Caucasian employees would perform this task, the Caucasian employees would watch, sometimes commenting "[w]ell, that's what we have the Mexicans for," in front of managers Mr. Jones, Mr. Simmons, and Mr. Pullen. Mr. Simmons and Mr. Pullen would give their tacit agreement by nodding their heads.

22.     Ms. Chavez was treated differently than her Caucasian co-workers in scheduling as well. Ms. Chavez did not have a regular schedule; although Caucasian co-workers were often given a regular schedule and asked by management what shifts or days-off they wanted. Ms. Chavez requested more hours in her schedule; however, Mr. Simmons and Mr. Pullen elected to hire others to perform the needed work. Three (3) individuals were hired and given the hours Ms. Chavez requested. All three hires were Caucasian.

5

23.     Beyond the disparate treatment Ms. Chavez received compared to her Caucasian colleagues, Ms. Chavez was also subjected to a racially hostile work environment where racial epithets and slurs were the norm.  When Hispanic customers would leave Defendant's store, managers Mr. Simmons and Mr. Pullen would comment that "[t]hey're in America! Speak OUR language – don't speak Spanish!" or "[h]ow come it is that there f*ckin' Mexicans come up here and look down on us because we don't speak Spanish!  They should speak English if they're gonna be here!"  Mr. Pullen and Mr. Simmons made these or similar remarks almost daily in the presence of Ms. Chavez and other Hispanic employees.

24.     Pete Jones, another manager of Defendant Advance, would converse with Caucasian customers about "f*ckin' Mexicans."  Mr. Jones, with his Caucasian customers, would go into hostile rants about Hispanic Americans all the while staring at Ms. Chavez in a manner belittling her presence at Defendant's store.  Ms. Chavez retorted that "[n]obody should be talking like that" and "why are you looking at me?"  Mr. Jones then began discussing Ms. Chavez's racial make-up, sneering, "[O]h, you're not Mexican?  I always thought you were!"

25.     Race was a predominant concern among the management staff at Defendant Advance.  Not only did management's racial slurs and comments create an environment where Hispanic employees were made to feel like second-class citizens, management often made comments and slurs in Spanish to demean Hispanic employees sexually.  In one instance, Mr. Simmons leered at Ms. Chavez while he said "peno*ha", a Spanish slang term for female genitalia, over and over again, pretending he was having trouble pronouncing the word.

26.     Ms. Chavez, who was fully qualified for advancement within Defendant Advance, made a request to Mr. Simmons for more hours and a move from part time to full time

employment.   At the time, Ms. Chavez had over four (4) years of experience as a commercial

delivery driver with Defendant Advance.

27.      Despite Ms. Chavez's repeated requests for full-time employment, which were

denied, Defendant Advance instead hired three (3) additional employees as commercial delivery

drivers, all of whom were Caucasian.

28.      Throughout this chain of events, Ms. Chavez reported her extreme offense to the

harmful and discriminatory acts of managers Pete Johns, Troy Simmons and Alan Pullen.  Ms.

Chavez complained to all three managers that their acts were extremely offensive and that she

believed she was not being assigned more hours because she was Native American and Spanish.

After Ms. Chavez complained about the disparate treatment affecting her hours and thus her pay,

Defendant Advance's attitude towards Ms. Chavez worsened.

29.      Almost immediately after Ms. Chavez complained of what she perceived to be

race-based discrimination, Defendant Advance began reducing and changing Ms. Chavez's

hours, refusing to compensate her for the other job duties Defendant required of her, and telling

her "I think [Employer X, Y and Z] is hiring, you should apply there."

30.      To the best of Ms. Chavez's knowledge and belief, managers Pete Johns, Troy

Simmons and Alan Pullen did not investigate Ms. Chavez's reports of racial discrimination and

hostile work environment.  Upon information and belief, no remedial action was taken as a result

of on Ms. Chavez's complaints.

31.      Consequently, Defendant Advance retaliated against Ms. Chavez by informing

her she should apply elsewhere, changing her schedule every week, and cutting her hours - thus

cutting her pay.  As a result, it became increasingly difficult for Ms. Chavez to perform her job

duties.

7

32.    On October 13, 2010, Defendant Advance concluded its campaign of retaliation against Ms. Chavez when Ms. Chavez was forced from her employment.   Ms. Chavez could not afford to continue her employment with Defendant Advance because Defendant had retaliated against Ms. Chavez by cutting her hours.  Her hours were cut to the point Ms. Chavez could not afford to remain employed at Defendant Advance.

33.    Ms. Chavez was forced from her employment with Defendant Advance and constructively discharged because no reasonable person could be expected to endure the racially hostile comments and environment perpetuated by Defendant Advance.  Ms. Chavez was subjected to demeaning racial epithets and disparate treatment compared to her Caucasian co-workers.  After months of reporting but with no resolution in sight, Ms. Chavez was forced to leave her employment as the only way for her to escape the racially hostile work environment.

34.    It is important to note that throughout the course of Plaintiff Chavez' employment with Defendant Advance, she never received an employee handbook or set of company policies.

## GENERAL ALLEGATIONS – MR. GALLEGOS

35.    Plaintiff Alex de-Luna-Gallegos ("Mr. Gallegos") repeats and re-alleges all previous paragraphs of this Complaint as though fully incorporated herein.

36.    Mr. Gallegos is Hispanic American of Mexican descent.

37.    At all times relevant hereto, Mr. Gallegos was fully qualified for his position.  As a salesperson, he had many years' experience working in retail.  In addition, he had completed the Automotive Tech course, which gave him experience and ample qualification for his job.

38.    Mr. Gallegos commenced his employment with Defendant Advance on April 23, 2008 as a part-time salesperson.

8

39.     Throughout the course of his employment with Defendant Advance, Mr. Gallegos performed his job duties in an exemplary fashion as evidenced by the pay raise he received. Mr. Gallegos consistently received feedback from his superiors that he was an excellent performer for the company.

40.     During the course of his employment with Defendant Advance, Mr. Gallegos became the victim of discrimination and retaliation due to his race, Hispanic, and color, brown.

41.     In December, 2009, Mr. Gallegos was promoted to the store's Key Carrier position. Mr. Gallegos asked Kevin Gooseman, the store's General Manager, if there was a raise with the promotion and increased job duties; however, Mr. Gooseman informed Mr. Gallegos it was only a management title. About seven (7) months later, a Caucasian employee was promoted to a Key Carrier position. This employee informed Mr. Gallegos he received a raise of $0.50 per hour for the Key Carrier position. Mr. Gallegos immediately complained to Mr. Gooseman about the difference in pay raises with promotions. Mr. Gooseman protested and refused to give Mr. Gallegos a raise with the Key Carrier promotion.

42.     It should be noted that at that time, Mr. Gallegos had received his Automotive Technology certificate and had more experience than the Caucasian employee described above, who did not have this certification or as many years of retail experience.

43.     In Spring, 2010, Mr. Gallegos began to notice disparate treatment by Defendant Advance of its non-Caucasian employees compared to Caucasian employees. First, Defendant Advance unveiled its new marketing campaign that singled-out and targeted Hispanic American employees. Employees who simply looked like Hispanic Americans were ordered to wear a 4-inch button with big, yellow, Spanish writing translated as "Look at me – I speak Spanish." These buttons singled out Hispanic American employees and were humiliating. Mr. Gallegos

reported the offensive nature of the button to his store manager, Mr. Gooseman, but Mr.

Gooseman informed Mr. Gallegos he had to wear the button.

44.     Defendant Advance also caused a sign to be displayed in the window of its store

confirming the message of the buttons, i.e. "Look for the Team Member who is wearing the

button, because they speak Spanish" (translated from Spanish). This poster further isolated the

Hispanic American employees as being different and apart from their Caucasian counterparts.

Mr. Gallegos complained about the poster to Mr. Gooseman, but the sign was not taken down.

As of December, 2010, despite Mr. Gallegos' reports, the sign was still being displayed.

45.     The disparate treatment inflicted upon Mr. Gallegos was not just isolated to the

Hispanic employees. Mr. Gallegos witnessed Mr. Gooseman and other managers actively avoid

Hispanic American customers regardless of whether they spoke English, Spanish or neither.

When a Hispanic American customer came into the store, Mr. Gooseman would flag down Mr.

Gallegos and say "Alex, you take this one – You're Mexican." Mr. Gallegos immediately

reported such offensive acts to assistant manager, Mark Hayes, and Mr. Gooseman. However,

Mr. Gooseman and Mr. Hayes responded that "they're hard to understand and you're Mexican –

you speak Spanish – you take them."

46.     Mr. Gallegos reported these acts of disparate treatment to his direct supervisors

Mr. Gooseman and Mr. Hayes repeatedly, most recently in April, 2010. Defendant Advance

took no action to protect Mr. Gallegos after he made the reports. Instead, shortly after Mr.

Gallegos complained, Mr. Gallegos was subjected to retaliation by Mr. Gooseman ultimately

resulting in Mr. Gallegos being terminated from his employment with Defendant Advance.

47.     On information and belief, Defendant Advance instructed Mr. Gallegos'

managers to target Mr. Gallegos for termination and find reasons to let him go in retaliation for

his lodging complaints to management.

48.     In May, 2010, Mr. Gallegos requested time off with two (2) weeks advance

notice. Defendant Advance granted the request; however, during Mr. Gallegos' absence,

Defendant Advance engaged in its ultimate act of retaliation against him and terminated Mr.

Gallegos employment without notification. Mr. Gallegos only discovered that he had been

terminated when he attempted to use his employee discount at a different Advance store. He was

given no reason for his termination.

49.     Its important to note Mr. Gallegos was not provided policies or procedures by

Defendant Advance for its employees under which victims of discrimination, retaliation or

harassment could complain.

### GENERAL ALLEGATIONS – MR. LUGO

50.     Plaintiff Diego Lugo ("Mr. Lugo") repeats and re-alleges all previous paragraphs

of this Complaint as though fully incorporated herein.

51.     Mr. Lugo is an Hispanic American of Mexican descent.

52.     Mr. Lugo commenced his employment with Defendant Advance on December 12,

2009 as a part-time Retail Associate.

53.     Mr. Lugo was fully qualified for his position at all relevant times and had

previous experience in the industry.

54.     Throughout the course of his employment with Defendant Advance, Mr. Lugo

was an excellent performer and received positive feedback from his managers.

11

55.     Throughout the course of his employment with Defendant Advance, Mr. Lugo
was subjected to a hostile work environment.  Mr. Lugo's supervisor Troy Simmons would make
frequent insults about Hispanic American employees and customers with comments like
"f*cking wetbacks" and "f*cking illegals."  When Mr. Lugo reported his offense to Mr.
Simmons, Mr. Simmons would respond that he was "pushing [Mr. Lugo] to the limit" to "see
where [Mr. Lugo's] breaking point is."

56.     Almost daily, Mr. Simmons would expound on his racial animosity.  Even the
smallest triggers could result in a hostile tirade.  When a Hispanic American customer would
come into the store, Mr. Simmons would began with "Mexicans are illegals who come into this
country to sponge off the hard working whites" followed shortly thereafter by "they are all lazy
and take advantage of the system."  Mr. Lugo was deeply offended because he is Mexican-
American.

57.     Mr. Simmons would also make racially hostile remarks and joke in Spanish in an
effort to degrade Hispanic American employees.  In December, 2010, Mr. Simmons began
taunting Mr. Lugo with "Tu pito es tamano de un mosca." (translated: "your d*ck is the size of a
fly.").  Other degrading comments by Mr. Simmons were "Mis juevos son tus ojos, puto!"
(translated: "my eyes are your balls, b*tch!").  After each occurrence of these degrading
comments and jokes, Mr. Lugo told Mr. Simmons to "quit it" and stated he was offended by the
comment.  Mr. Simmons' behavior did not change.

58.     Mr. Simmons was not alone in expressing his racial animosity toward minorities.
Mr. Pullen also made extremely offensive racial remarks.  Mr. Pullen joked about watermelon
juice at the White House, and different terms for "blacks" – i.e. "a black man wearing a white
belt is called an oreo" and "a black man with white buttons on his shirt is called a domino."

12

59.     Not only was Mr. Lugo's working environment racially hostile, he was also
treated disparately compared to his Caucasian co-workers.  Some of his Caucasian co-workers
were compensated at a rate of $9.60 per hour, but Mr. Lugo was being compensated at only
$9.25 per hour.  These co-workers had different job titles than Mr. Lugo but were below Mr.
Lugo's position in the company's organization.  Mr. Lugo was also being paid less than his
Caucasian co-workers of the same job title.  Based upon Mr. Lugo's qualifications and those of
his Caucasian colleagues, the only logical explanation for the difference in pay rate is race.

60.     Mr. Lugo reported the offensive remarks and acts to his supervisors Mr. Simmons
and Mr. Pullen.  Beginning in August, 2010, Mr. Lugo began reporting every incident of racial
hostility or disparate treatment he witnessed to Mr. Simmons.  At that point, Mr. Simmons began
retaliating against Mr. Lugo.  Plaintiff Carlos Guiterrez-Nira informed Mr. Lugo that he was
privy to Mr. Simmons and Mr. Pullen's conversation about terminating Mr. Lugo's employment.

61.     Mr. Lugo began fearing for his job after co-plaintiff and co-worker Mr. Nira
informed him management was looking to terminate his employment.  In January, 2011, Mr.
Nira was suspended from Defendant Advance.  Mr. Lugo saw the suspension as an act of
retaliation because Mr. Lugo was aware Mr. Nira had complained to management about the race-
based discrimination and racially hostile work environment.  Based on Defendant Advance's
treatment of Mr. Nira after he reported the hostile work environment, Mr. Lugo became very
frightened for his job.

62.     In February, 2011, Mr. Lugo was forced from his employment with Defendant
Advance.  Based upon the continuing pattern of unremitting racial hostility, as well as
information he received from Plaintiff Mr. Nira, who had reported the racially hostile work
environment, Mr. Lugo believed the future of his employment was limited.  Fearing that

13

termination could hinder his ability to procure employment in the future, Mr. Lugo was forced to

resign his position with Defendant Advance. The racial hostility and disparate treatment created

by Defendant Advance were so offensive that no reasonable person could be expected to tolerate

it. Defendant constructively discharged Mr. Lugo.

## GENERAL ALLEGATIONS – MR. NIRA

63.    Plaintiff Carlos Guiterrez-Nira ("Mr. Nira") repeats and re-alleges all previous

paragraphs of this Complaint as though fully incorporated herein.

64.    Mr. Nira is Hispanic American and African-American.

65.    Mr. Nira commenced his employment with Defendant Advance on May 15, 2008

as a Commercial Sales Manager.

66.    Mr. Nira was fully qualified for his position at all relevant times. Mr. Nira has

years of previous experience as a Commercial Sales Manager.

67.    Throughout the course of his employment with Defendant Advance, Mr. Nira was

an excellent performer and received positive feedback from his managers.

68.    Starting in November, 2008, Mr. Nira became the victim of race-based

discrimination. Store Manager Troy Turner replaced Mr. Nira with a Caucasian employee. Mr.

Nira was far more qualified for the position than his Caucasian replacement because he had more

experience with the position and was bilingual. This gave Mr. Nira the advantage of serving that

segment of the population – a segment Advance was specifically targeting - that only speaks

Spanish.

69.    About three weeks after Mr. Turner demoted Mr. Nira in favor of a less-qualified

Caucasian employee, Mr. Turner then cut Mr. Nira's pay by $1.00 per hour. Mr. Turner

demanded that Mr. Nira sign a writing indicating the pay cut was voluntary; however, Mr.

Turner told Mr. Nira blatantly that failure to sign the writing would result in Mr. Nira's immediate termination. Mr. Nira witnessed a similar course of events happen to two other Hispanic American managers with Defendant Advance, whereby each was demoted and had their pay cut.

70.     Mr. Nira immediately complained about the demotion and pay cut to Mr. Turner. To the best of Mr. Nira's knowledge and belief, Mr. Turner did not investigate or take any remedial action on behalf of Mr. Nira. Instead, Mr. Turner transferred Mr. Nira to a different store located in the same city. Unfortunately, Mr. Nira found the environment at his new store to be extremely racially hostile. As a matter of course, Hispanic American employees were treated disparately than their Caucasian co-workers.

71.     At no point throughout his employment with Defendant Advance was Mr. Nira ever given an employee manual or handbook. Mr. Nira was never made aware of, trained in or otherwise made able to use any procedure Defendant Advance may have had to contact and report problems. Mr. Nira reported his concerns and complaints of hostility and discrimination to Mr. Turner. Once transferred, Mr. Nira reported racial discrimination and racially hostile work environment to Mr. Pullen and Mr. Simmons.

72.     Mr. Nira experienced being singled out on the basis of his race, Hispanic, at the store he was transferred to. In May, 2009, Defendant Advance demanded its Hispanic American employees wear 4-inch buttons with bright yellow letters explaining in Spanish "Look at me – I speak Spanish." Mr. Nira objected to wearing the button on the basis it singled out and humiliated the Hispanic American employees. Mr. Nira reported his offense to Mr. Pullen and Mr. Simmons but Defendant Advance never took any action on his behalf.

15

73.    Hispanic American employees were singled out for certain less favorable or more physically demanding jobs at Defendant Advance as well. In the usual course of business, Defendant Advance's stores receive product for sale to customers. Defendant Advance, through its managers Mr. Pullen and Mr. Simmons, would require the Hispanic American employees to remove merchandise from the truck, and place it in the store's inventory area, a very labor intensive job. Caucasian employees, on the other hand, would often gather around the Hispanic American employees and watch while the Hispanic American employees unloaded and stored the entire truck-full of merchandise. Mr. Pullen and Mr. Simmons made it a point to demand only the Hispanic American employees complete this labor-intensive task.

74.    Mr. Nira was also individually singled out by manager, Troy Simmons. Mr. Simmons would sometimes make his derogatory remarks and jokes to Mr. Nira in Spanish, because Mr. Nira is Hispanic American. In one exchange, Mr. Simmons told Mr. Nira "Mis juevos son tus ojos, puto!" (translated "My balls are your eyes, b*tch!"). Mr. Simmons went on to comment, "Tu pito es tamano de un mosca" (translated "Your d*ck is the size of a fly."). Mr. Nira told Mr. Simmons to "Stop!" and "That's not nice!" However, Mr. Simmons continued to persist. Mr. Simmons questioned whether Mr. Nira had "a hard time with me doing that?" When Mr. Nira responded in the affirmative, Mr. Simmons did not take remedial action; instead, he dismissed his remark, saying, "That's just me being stupid."

75.    Additionally, Troy Simmons and Alan Pullen perpetuated an environment of racial animosity. In June, 2010, in referring to Plaintiff Mr. Lugo, Mr. Nira heard Mr. Simmons comment, "Aw, we don't need him – we'll just fire that wetback and get a new one." Mr. Simmons also made daily derogatory comments about "Mexicans" and how they are "lazy." Mr. Simmons would also express his displeasure with the race of the President of the United States;

16

often calling him a "f*cking nigger" and on a few occasions Mr. Simmons indicated the

President should be shot or that he should be  fed fried chicken and watermelon at the White

House.  In fact, when a Caucasian woman customer entered the store with a non-Caucasian child,

Mr. Simmons would joke "that one musta gone over the fence" meaning the fence between

races.  Mr. Simmons would call such behavior "going over to the dark side."  Mr. Simmons

knew his comments, jokes and representations were offensive and inappropriate as he called

himself "an H.R. nightmare".

76.    Mr. Simmons and Mr. Pullen also made racist jokes and comments about

Hispanic American customers.  When an Hispanic American customer would purchase items

from the store, Mr. Simmons and Mr. Pullen would rant, "Where in the f*ck do these f*cking

wetbacks get the money to spend so f*cking much on their cars?" or "Trust a f*cking Mexican to

be the only one out there at this time of night working on their car" or "If those lazy f*ckers

would get jobs instead of living off American dollars, I bet they wouldn't be out here."  These

comments offended Mr. Nira and he complained to Mr. Pullen and Mr. Simmons.

77.    Mr. Nira reported the discrimination and racially hostile work environment to his

managers Mr. Pullen and Mr. Simmons.  In fact, when these managers made the racist

comments, jokes or remarks, Mr. Nira would respond with "that's not funny" or "that's not nice"

or "take it easy."  Mr. Pullen and Mr. Simmons were well aware that Mr. Nira found their

behavior and actions offensive and that such behavior was creating a racially hostile work

environment.

78.    After Mr. Nira reported the discrimination he witnessed and was subjected to,

along with the racially hostile work environment at Defendant Advance, Mr. Nira became the

target of retaliation by Mr. Simmons and Mr. Pullen.  Mr. Pullen and Mr. Simmons both

17

confirmed that they were planning to terminate Mr. Nira's employment with Defendant Advance in the presence of Plaintiff Mr. Lugo. Starting thereafter, Mr. Nira became very cautious.

79.    On information and belief, Defendant Advance instructed Mr. Nira's managers to target Mr. Nira for termination and find reasons to let him go in retaliation for his lodging complaints to management.

80.    In November, 2010, Mr. Nira was working at a cash register when he noticed that the drawer contained an additional $50.00 it was not supposed to have. Mr. Nira put the $50.00 bill in an envelope, marked it, and put it in the company's safe. When Mr. Nira reported the incident to Mr. Pullen, Mr. Pullen became embarrassed as his face turned red. On December 5, 2010, Mr. Nira was working the cash register again and noticed his drawer contained an additional $20.00 it was not supposed to have. Again, Mr. Nira followed the same procedure and reported the issue the next day. Co-workers informed Mr. Nira that Mr. Simmons and Mr. Pullen had confided in them that they were trying to bait Mr. Nira's drawer in order to terminate his employment for stealing money. After Mr. Nira was given this information, he knew he was being targeted for termination by Mr. Simmons and Mr. Pullen.

81.    In January, 2011, Mr. Nira began attempting to locate potential witnesses who could testify about the racially hostile work environment at Defendant Advance. One such witness contacted Defendant Advance via Mr. Pullen. As Mr. Pullen's final retaliatory act against Mr. Nira, within one week of Mr. Pullen taking this phone call, Mr. Nira was terminated from his employment with Defendant Advance on January 12, 2011. On his last day of employment, Mr. Nira had clocked in for work and was told by Mr. Pullen that there was a problem with two (2) returns Mr. Nira completed the day prior. Mr. Pullen indicated the returned item for both returns was missing including the return paperwork. Mr. Nira thought this

18

situation odd, since the paperwork for the return and the returned item are kept separately. Mr. Nira was sent home pending an investigation. Since that time, Defendant Advance has not contacted Mr. Nira about reinstatement.

82.    As a result of the discrimination Mr. Nira endured and the racially hostile work environment he was subjected to, Mr. Nira suffered mental distress and anguish diagnosed as depression and anxiety.

## GENERAL ALLEGATIONS – MR. ROGERS

83.    Plaintiff Antonio Rogers ("Mr. Rogers") repeats and re-alleges all previous paragraphs of this Complaint as though fully incorporated herein.

84.    Mr. Rogers is an Hispanic American of Mexican descent.

85.    Mr. Rogers commenced his employment with Defendant Advance in November, 2008 as a First Assistant Manager. Mr. Rogers submitted his resume online through a third party placement service, CareerBuilder.com. April Galambos conducted Mr. Rogers' initial interview over the phone. Mr. Rogers had a second interview over the phone with District Manager Jennifer Val. Ms. Val hired Mr. Rogers as the First Assistant Manager of the Greeley, Colorado location at a rate of $11.00 per hour. Mr. Rogers would introduce himself as "Tony" throughout the interviews because it is his preferred moniker. When Mr. Rogers arrived for his first day of work in November, 2008, Kevin Gooseman met Mr. Rogers in person for the first time. Mr. Gooseman immediately indicated he was displeased with Mr. Rogers being the First Assistant Manager. Mr. Gooseman informed Mr. Rogers that he was being demoted to Second Assistant Manager, even before Mr. Rogers had started one minute of work for Defendant Advance. Along with a demotion, Mr. Rogers also received a pay cut of $1.00 per hour to $10.00 per hour.

86.    Mr. Rogers was fully qualified for the First Assistant Manager position at all relevant times and had previous management experience. Upon his discovery of Mr. Rogers' race and ethnicity, Mr. Gooseman informed Mr. Rogers he was being demoted with a pay cut.

87.    Throughout the course of his employment with Defendant Advance, Mr. Rogers was an excellent performer and received positive feedback from his managers as a Second Assistant Manager.

88.    Mr. Rogers was subjected to discrimination based on his race, Hispanic American, and also endured a racially hostile work environment throughout his tenure with Defendant Advance. After being demoted upon arriving for his first day of work for no other reason than his race, Mr. Rogers was threatened and intimidated on the basis of his race, Hispanic. Shortly after commencing his employment, Mr. Rogers came upon a cartoon in the back office that depicted a Hispanic American male strung from a rope being beaten with a stick by a Caucasian Border Patrol Officer. Mr. Rogers was extremely offended by the cartoon. When Mr. Rogers tried to confront the person who posted the cartoon, no one would come forward.

89.    Mr. Rogers was continually singled out based on his race, Hispanic American. Other Defendant Advance locations would contact Mr. Rogers in his off hours requesting him to translate for Spanish-speaking customers. Most appalling was the tone of these requests – often, Mr. Rogers was told, "You're Mexican! Tell this guy how much this part is."

90.    Mr. Rogers reported that he felt he was being singled out due to his race to Mr. Gooseman after each request was made during his off duty hours without compensation. Mr. Rogers reported that he would like to have some time off and not be on call all the time while away from the store. However, these requests during off hours for Spanish translation did not

20

abate, rather, they intensified.  In fact, even after Mr. Rogers was terminated by Defendant

Advance, he still received phone calls requesting his assistance with Spanish translation.

91.     Other Hispanic American employees were also singled out on an almost daily

basis.  Mr. Gooseman, along with other Caucasian employees, often made generalized comments

about Hispanics American employees, calling them "lazy," "ignorant" or even "thieves."  Mr.

Gooseman even commented once "the Mexicans shouldn't have advancement opportunities."

92.     Mr. Rogers reported his offense and disgust to Mr. Gooseman's about his and

other's racial comments.  Mr. Gooseman responded that "we're just joking."

93.     Defendant Advance also singled out its Hispanic American employees with its

button campaign.  Defendant Advance made any Hispanic American looking employee wear

buttons stating in Spanish "Look at Me – I speak Spanish."  Mr. Rogers, along with other

Hispanic employees, felt singled out by the button campaign.  Mr. Rogers complained directly to

Mr. Gooseman about his displeasure and offense with wearing the buttons.  Mr. Gooseman

informed Mr. Rogers that the button was considered part of *his* uniform and therefore failure to

wear the button for Mr. Rogers would be a job code violation.

94.     Joe Montez was transferred to Mr. Rogers' store as the First Assistant Manager by

the then District Manager of Defendant Advance.  Mr. Gooseman became very upset with having

a Hispanic American as the First Assistant Manager.  Mr. Gooseman then targeted Mr. Montez

by cutting his hours, thereby cutting his pay.

95.     Instead of taking action on Mr. Rogers' or any of the Hispanic American

employees' behalf, Mr. Gooseman complained to Mr. Rogers about Spanish being spoken in the

United States.  Mr. Gooseman lamented the fact Defendant Advance even had to have the

21

buttons because "people in America shouldn't speak anything but English." This was also Mr. Gooseman's response to Mr. Rogers' reports of being called to work during off hours.

96.    Mr. Montez informed Mr. Rogers that Defendant Advance had a policy of giving bonuses to those employees above the Sales Clerk position. Mr. Rogers was shocked to learn of this incentive because he had been employed with Defendant Advance for about a year at this point and had never received any bonus whatsoever; he had never even been told about the incentive program.

97.    Not only did Mr. Rogers report the racial jokes, slurs and mistreatment to Mr. Goosemen, Mr. Rogers specifically reported the bonus deficiency up the chain of command by filing a complaint with Defendant Advance. After this report, Mr. Rogers became the victim of retaliation by Defendant Advance.

98.    Despite claims of confidentiality, one manager berated Mr. Rogers only days after he filed his complaint with Defendant Advance. The manager insisted that he could not "understand" [Mr. Rogers making a complaint] and then proceeded to yell and throw a tirade against filing complaints and the people who filed them. Not only did all of management know Mr. Rogers had filed a complaint, other co-workers were also made aware of his complaint and the content there of by Defendant Advance.

99.    After Mr. Rogers reported the discrimination and hostile working environment, Defendant Advance cut Mr. Rogers weekly hours from 40 to 32. This equated to a loss of eight (8) hours of pay each week.

100.    Defendant Advance, by and through Jeff Ellis, a human resource department representative, responded to Mr. Rogers' report on the bonus issue, racial discrimination and hostile work environment via telephone call. Mr. Rogers explained to Mr. Ellis that he was

22

being targeted and discriminated against on the basis of his race. Mr. Ellis response was "this

didn't really happen" and "hang in there little buddy." At no time did Mr. Ellis indicate he

would take Mr. Rogers complaint seriously, would investigate Mr. Rogers complaint, or would

take any action whatsoever on behalf of Mr. Rogers. At the end of the conversation, Mr. Ellis

made it clear to Mr. Rogers that Defendant Advance was not going to take any remedial action

on his behalf. Mr. Ellis' use of the term "little buddy" in the context of a racially hostile work

environment only perpetuated and intensified the intimidation and humiliation promulgated by

Defendant Advance against Mr. Rogers.

101.    In May, 2010, Mr. Rogers was asked to serve as the store's acting General

Manager when its current general manager quit. Mr. Rogers requested a pay increase

commensurate with his promotion to acting General Manager. Mr. Rogers made his request to

Mr. Hindman, District Manager of Defendant Advance. Mr. Hindman responded, "No, we have

someone else in mind for the job." Mr. Rogers was devastated he was being asked to work as a

General Manager but remain compensated at two full levels below, a Second Assistant Manager.

102.    Mr. Hindman made other visits to the store location while Mr. Rogers was acting

General Manager. On each and every one of these visits, Mr. Hindman indicated to Mr. Rogers

that the new general manager would be bilingual. Mr. Hindman made this representation so

often to Mr. Rogers, it seemed Mr. Hindman was implying Mr. Rogers would no longer be the

only bilingual employee. The new general manager did not commence his employment at the

store until Mr. Rogers was forced from Defendant Advance. Upon information and belief, the

new general manager is Caucasian and does not speak Spanish.

103.    Mr. Rogers was forced from his employment with Defendant Advance as a result

of the retaliation and discrimination he endured. No reasonable person could have endured the

racial animosity, intimidation and fear promulgated at Defendant Advance. Mr. Rogers was demoted upon arrival and never given any opportunity to be promoted or increase his pay. Instead, Mr. Rogers was forced to work in his off hours and be on call all the time. No Caucasian employee was forced to endure this treatment. As Mr. Rogers continually reported the racist environment he found himself, the retaliation against him continued to mount and intensify. Mr. Rogers was not being promoted, was being demoted, and was being told his complaints of racial hostility were not important. Mr. Rogers had no other choice but to leave, and thus, was constructively discharged from his employment with Defendant Advance.

## STATEMENT OF CLAIMS

### FIRST CLAIM FOR RELIEF – ALL PLAINTIFFS

(Race Discrimination in violation of Title VII of the Civil Rights Act,
42 U.S.C. § 2000(e) *et seq.*, against Defendant Advance)

104.    Plaintiffs repeat and re-allege all previous paragraphs of this Complaint as though fully incorporated herein.

105.    Plaintiffs were qualified for their respective positions during all times relevant times hereto.

106.    Ms. Chavez is a Native American and Spanish American female.

107.    Mr. Gallegos is a Hispanic American male.

108.    Mr. Lugo is a Hispanic American male.

109.    Mr. Nira is a Hispanic American and African-American male.

110.    Mr. Rogers is a Hispanic American male.

111.    Defendant Advance discriminated against each Plaintiff on the basis of their race.

24

112.    The race-based discrimination to which Plaintiffs were subjected adversely affected the terms and conditions of their employment with Defendant Advance.

113.    Defendant Advance's conduct in discriminating against Plaintiffs on the basis of their race was an unlawful employment practice in violation of Title VII.

114.    The effect of Defendant Advance's unlawful employment practice has been to deprive Plaintiffs of equal employment opportunities and otherwise adversely affect their status as an employee.

115.    Defendant Advance's unlawful employment practice was intentional.

116.    Defendant Advance's actions were wilful, wanton, malicious and/or in reckless disregard of Plaintiffs' protected rights against discrimination under Title VII.

117.    As a direct and proximate result of Defendant Advance's unlawful and intentional discriminatory conduct, Plaintiffs have suffered both economic and non-economic losses and injuries.  Plaintiffs pray for relief from their injuries and losses as more fully set forth below in paragraph 132.

## SECOND CLAIM FOR RELIEF – ALL PLAINTIFFS

(Race Discrimination Under 42 U.S.C. § 1981 against Defendant Advance)

118.    Plaintiffs repeat and re-allege all previous paragraphs of this Complaint as though fully incorporated herein.

119.    Defendant Advance's conduct as set forth herein deprived Ms. Chavez, a Native American and Spanish American, Mr. Nira, an African American and Hispanic American, and Mr. Gallegos, Mr. Lugo and Mr. Rogers, Hispanic Americans, of the rights and privileges to make and enforce a contract as protected by Section 1981.

120. As a proximate result of Defendant Advance's unlawful actions, Plaintiffs have suffered economic and non-economic damages.

121. Defendant Advance's violations of Section 1981 were intentional.

122. Defendant Advance's violations of Section 1981 were willful, wanton, malicious and/or in reckless disregard of Plaintiffs' federally protected rights.

123. As a direct and proximate result of Defendant Advance's unlawful and intentional conduct, Plaintiffs have suffered both economic and non-economic losses and injuries. Plaintiffs pray for relief from their injuries and losses as more fully set forth below in paragraph 132.

## THIRD CLAIM FOR RELIEF – ALL PLAINTIFFS

(Hostile Work Environment Claim in violation of Title VII of the Civil Rights Act,
42 U.S.C. § 2000(e) *et seq.*, against Defendant Advance)

124. Plaintiffs repeat and re-allege all previous paragraphs of this Complaint as though fully incorporated herein.

125. Defendant maintained and condoned a racially hostile work environment that was pervasive and severe.

126. Plaintiffs were subjected to a pervasive and severe racially hostile work environment by Defendant Advance because of their race.

127. The racially hostile work environment to which Plaintiffs were subjected adversely affected the terms and conditions of their employment with Defendant Advance.

128. Defendant Advance's conduct in maintaining and condoning a hostile work environment on the basis of Plaintiffs' race was an unlawful employment practice in violation of Title VII.

26

129.    The effect of Defendant Advance's unlawful employment practice has been to adversely affect Plaintiffs' status as employees.

130.    Defendant Advance's unlawful employment practice was intentional.

131.    Defendant Advance's conduct was wilful, wanton, malicious and/or was performed in reckless disregard for Plaintiffs' protected rights under Title VII.

132.    As a direct and proximate result of Defendant Advance's unlawful and intentional conduct, Plaintiffs have suffered both economic and non-economic losses and injuries.  Plaintiffs pray for relief from their injuries and losses in an amount to be determined at trial but which includes backpay, frontpay, damages for emotional distress, punitive damages, attorneys fees and costs, expert witness fees, pre- and post judgment interest and all other relief in accord with Title VII, 42 U.S.C. §§ 1981, 2000.

## FOURTH CLAIM FOR RELIEF – ALL PLAINTIFFS

(Retaliation under 42 U.S.C. § 1981, against Defendant Advance)

133.    Plaintiffs repeat and re-allege all previous paragraphs of this Complaint as though fully incorporated herein.

134.    Plaintiffs engaged in the protected activity of reporting race discrimination to managers of Advance and/or to Human Resources personnel of Advance.

135.    Plaintiffs suffered adverse employment action by Defendant Advance during their respective courses of employment, including but not limited to, being demoted to a lower-ranking positions, having their compensation cut, and ultimately being terminated or forced from their employment with Defendant Advance, all in retaliation for their reports of race discrimination.

27

136.    Defendant Advance knew Plaintiffs engaged in the above-stated protected activities.  The adverse actions taken by Defendant Advance were caused by Plaintiffs' complaints of race discrimination.

137.    Defendant Advance's conduct was wilful and wanton, or performed in reckless disregard for Plaintiffs' protected rights against retaliation under Section 1981.

138.    As a direct result of Defendant Advance's unlawful and intentional conduct, Plaintiffs have suffered both economic and non-economic losses and injuries.  Plaintiffs pray for relief from their injuries and losses as more fully set forth below.

### FIFTH CLAIM FOR RELIEF - ALL PLAINTIFFS

(Retaliation under Title VII of the Civil Rights Act, 42 U.S.C. § 2000(e) *et seq*., against Defendant Advance)

139.    Plaintiffs repeat and re-allege all previous paragraphs of this Complaint as though fully incorporated herein.

140.    Plaintiffs engaged in the protected activity of reporting race-based discrimination and a racially hostile work environment.

141.    Plaintiffs suffered adverse employment actions by Defendant Advance during the course of their employment.

142.    Plaintiffs suffered adverse employment actions by Defendant Advance during their respective courses of employment, including but not limited to, being demoted to a lower-ranking positions, having their compensation cut, and ultimately being terminated or forced from their employment with Defendant Advance, all in retaliation for their reports of race-based discrimination.  Additionally, Plaintiffs Mr. Nira and Mr. Gallegos were targeted for termination

28

by Defendant Advance. Ultimately, Plaintiffs Mr. Nira and Mr. Gallegos' employment was abruptly terminated in a retaliatory act by Defendant Advance.

143.    Defendant Advance retaliated against Ms. Chavez, Mr. Lugo and Mr. Rogers by denying them advancement opportunities. Further, Defendant Advance retaliated against Plaintiffs Mr. Nira and Mr. Rogers by denying them other job opportunities, pay commensurate with positions held, and promotions and targeting Mr. Nira for termination. Finally, Mr. Nira's and Mr. Gallegos' employment was terminated by Defendant Advance in its final retaliatory act.

144.    Plaintiff Mr. Rogers was shunned by Defendant Advance's Human Resources department, belittled and degraded by his co-workers, denied a pay raise commensurate with the position he held, and a pay cut due to less and less hours. Ultimately, Plaintiff Mr. Rogers' was forced from his employment in a retaliatory act by Defendant Advance.

145.    Defendant Advance knew that Plaintiffs engaged in the above stated protected activities. The adverse actions taken by Defendant Advance were a direct cause of Plaintiffs' engaging in the protected activity of lodging complaints of race-based discrimination and racially hostile work environment.

146.    Defendant Advance's conduct was wilful, wanton, malicious and/or in reckless disregard of Plaintiffs' protected rights against retaliation under Title VII.

147.    As a direct result of Defendant Advance's unlawful and intentional conduct, Plaintiffs have suffered both economic and non-economic losses and injuries. Plaintiffs pray for relief from their injuries and losses, as more fully set forth below.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully pray for an order of this Honorable Court entering judgment in their favor against Defendant Advance, and that it award Plaintiffs' actual

economic damages in an amount to be determined at trial and compensate them for any lost

wages, benefits and lost employment opportunities including back and front pay, award

Plaintiffs' compensatory damages including but not limited to those for future pecuniary losses,

emotional pain and suffering, inconvenience, mental anguish and other nonpecuniary losses,

award Plaintiffs punitive damages as allowed by law and to be determined at trial, award

Plaintiffs reasonable attorneys fees and costs of this litigation, expert witness fees, award

Plaintiffs pre-judgment interest and post-judgment interest as provided by law, and for such other

and further relief as this court deems necessary, just and proper.

**PLAINTIFFS REQUEST A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 5th day of September, 2013.

Respectfully submitted,

GRANT, HOFFMAN & KAMADA, PC

/s/ Thomas D. Grant Attorney

Thomas D. Grant, Attorney (22619)
Brad L. Hoffman Attorney (34635)
Grant, Hoffman & Kamada, PC
821 Ninth Street
Greeley, CO    80631
Telephone:  (970) 356-5666
FAX:  (970) 356-8967 fax
E-mail: bhoffman@greeleyattorneys.com
Attorney for Plaintiffs

McNAMARA, ROSEMAN & KAZMIERSKI, LLP

/s/  Todd J. McNamara Attorney

Todd J. McNamara Attorney
McNamara, Roseman & Kazmierski, LLP
1640 East Eighteenth Avenue
Denver, CO 80218

30

Telephone:  (303) 333-8700
FAX:  (303) 331-6967
Email:  tjm@18thavelaw.com
Attorney for Plaintiffs

McNAMARA, ROSEMAN & KAZMIERSKI, LLP

/s/  Matthew S. Shechter Attorney

_____

Matthew S. Shechter Attorney
McNamara, Roseman & Kazmierski, LLP
1640 East Eighteenth Avenue
Denver, CO 80218
Telephone:  (303) 333-8700
FAX:  (303) 331-6967
Email:  mss@18thavelaw.com
Attorney for Plaintiffs

31